UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 6:21-CR-13-GFVT-HAI-4 |
| | ) | |
| v. | ) | RECOMMENDED DISPOSITION |
| | ) | & ORDER |
| MARK GRENKOSKI, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

*** *** *** ***

Defendant Mark Grenkoski was alone in his Knoxville, Tennessee home when law enforcement executed a search warrant on the morning of December 13, 2018. As many as fourteen officers were involved. D.E. 424 at 24. Forty-five minutes after the initial entry, two officers interviewed him in his home theater[1] while the search of his house was concluded. The interview was recorded, and the four hour, 18-minute recording is filed in the record. D.E. 285, 286. Grenkoski has moved to suppress that interview on the basis his *Miranda* rights were violated and his statements were coerced. Having conducted an evidentiary hearing, the undersigned recommends that the motion be denied.

This case involves the multi-year investigation of a multi-site clinic ("Express Health Care" or "EHC") on suspicions of pill diversion and accompanying fraud. This is one of numerous defensive motions filed by the medical-provider defendants in this matter.

On July 1, 2022, Grenkoski filed his "Motion to Suppress Statements," accompanied by investigatory reports. D.E. 284, 288. The government responded in opposition. D.E. 319.

---

[1] The theater room is also referred to as a bonus room or media room in the hearing testimony.

1

Grenkoski replied. D.E. 367. On September 19, 2022, the Court conducted an evidentiary hearing. D.E. 414. The Court heard testimony from the two officers who interviewed Grenkoski and two other officers involved in the search. Grenkoski's wife and her mother also testified. D.E. 412. Grenkoski also filed a post-hearing brief. D.E. 452.[2] A transcript of the hearing is filed in the record. D.E. 424.

The first question is whether Grenkoski was in custody during his interview, such that *Miranda* warnings should have been given. The second question is whether his statements were involuntarily coerced.

## I. Evidence at the Hearing

### A. FBI Special Agent Doran

The first witness was FBI Special Agent James John Doran II. He joined the FBI in 2017 after ten years with the Knox County (Tennessee) Sheriff's Office. Since late 2017, he had been involved in the EHC investigation with the Lexington, Kentucky DEA office. SA Doran said he became involved in this case because Tennessee Highway Patrol records were showing lots of opioid arrests, and Doran wanted to find out who was responsible for providing these opioids. He discovered the Lexington DEA was already investigating EHC.

SA Doran testified that there was a planning meeting in Knoxville the evening of December 12, 2018, prior to the next day's execution of multiple search warrants. Twenty to thirty officers and investigators from multiple agencies were involved. Doran testified that SA Jared Sullivan gave the overall instructions for the execution of the warrants. The plan was that officers would only be conducting searches; no arrests were to be made. And physicians under investigation were

---

[2] The government filed a post-hearing brief on October 19, 2022. D.E. 466. That brief was due to be filed by October 17—ten days after Grenkoski's brief was filed. D.E. 414 ("The United States shall file any response **no later than 10 days** following the brief of the Defendant."). The Court will disregard and strike that late-filed brief.

2

to be told they would not be arrested that day.

SA Doran testified that, at 9:28 a.m., he knocked on Grenkoski's door. When Grenkoski answered, Doran asked him to step outside. Doran and about seven other armed officers went in through the front door and did a safety sweep. Grenkoski then was allowed back inside and ended up sitting at the kitchen table.

SA Doran did not stay with Grenkoski during the search, and he was not one of the two officers who conducted the interview. Doran did speak with Grenkoski some prior to the interview, but their conversation was not about the investigation. SA Doran searched several rooms, including the "bonus room" where the interview took place.

SA Doran did not recall ever telling Grenkoski he was free to leave or that he did not have to answer questions. He never saw Grenkoski physically restrained or threatened with arrest. He had no recollection of any members of Grenkoski's family arriving.

SA Doran testified that, as far as he knew, all the officers left by about 12:39 p.m. Before leaving, he explained to Grenkoski the items that had been seized. This included a small quantity of marijuana. SA Doran said no one threatened to arrest Grenkoski over the marijuana, Doran simply told him it was being seized.

## B. Detective Hopkins

The second witness was Marcus Hopkins, who at the time was a detective with the pill-diversion task force of the Kentucky Attorney General's Office. Det. Hopkins had previously worked for 21 years with the Kentucky State Police, plus three years with the Laurel County Sheriff's Office. Prior to December 13, 2018, Hopkins was already "briefly" involved in the investigation. D.E. 424 at 39.

Det. Hopkins was one of Grenkoski's interviewers. It was he who made the recording, but

he did not tell Grenkoski they were being recorded.  He recalled that someone, probably SA Sullivan, had assigned him to attempt to interview Grenkoski.  Det. Hopkins testified he was late getting to Grenkoski's house on the morning of the search.  Agents had already entered, and Hopkins had to park on the street.

Det. Hopkins first met Grenkoski when he walked into the kitchen and saw Grenkoski sitting with Officer Rosing and Special Agent Highsmith, whom Hopkins did not know at the time. Det. Hopkins testified he asked Grenkoski "if he would be willing to speak with us."  D.E. 424 at 45.  As Hopkins explained in more detail on cross-examination:

> I walked into the kitchen, and I went to the table.  I introduced myself as being my name, who I worked with, and asked him if he would be willing to talk to us.  And he answered that he was just a little freaked out with the people coming to the door, all the people, you know, that was there.  And so I further explained what I wanted, you know.  I wanted to talk to him, ask him some questions about EHC or ask him if he was willing to talk, and that's when he said he was a little freaked out.  I said, well, I would like to ask you some questions about EHC, how it's ran, to get his side of how things were done.  I explained to him it's up to him. He didn't have to.

D.E. 424 at 55-56.  These exchanges happened before the recording began.

Det. Hopkins gave no *Miranda* warning.  He did not tell Grenkoski he could call an attorney.  He never told Grenkoski he was free to leave and did not know if anyone else had told him that.  He "didn't see it as a custodial interview."  D.E. 424 at 63.

Det. Hopkins testified he asked Grenkoski if they could go to a quieter place because the kitchen was too busy and loud.  Grenkoski recommended the theater room upstairs, and he led the officers there.  Det. Hopkins activated his recorder on the way upstairs.  The theater room was "pretty good sized" (D.E. 424 at 54) and had seating on all three sides.  The interviewers sat six to eight feet away from Grenkoski, who seated himself at the far end of the room.  The interviewers would have had to leave their seat to touch him.  If there was a door into the room, it was not

closed.  They could hear noise from downstairs.

According to Det. Hopkins, Grenkoski was never physically restrained, handcuffed, or threatened with arrest.  He never asked to leave or to stop the interview.  Det. Hopkins never told him he had to stay or to answer questions.  Hopkins testified he never raised his voice.

Det. Hopkins agreed that a four-hour interview was "rather lengthy."  D.E. 424 at 46.  Det. Hopkins did not want the interview to drag on so long; he was "certainly not" making it longer to wear Grenkoski down.  *Id.* at 64.  It is simply his practice to let the subject talk as long as they want to.  Grenkoski educated the interviewers about his field of work.  Grenkoski gave long narrative answers; the interviewers never had to work to pull information out of him.

Grenkoski did not appear nervous to Hopkins; Hopkins considered the interview time a "very light atmosphere," in which Grenkoski joked around.  Hopkins agreed that people might joke around on account of being nervous.  D.E. 424 at 49.  Grenkoski joked about prior troubles with the IRS, and jokingly asked if he would get arrested if he threw something at Hopkins.  When officers found a shotgun downstairs, Grenkoski made a joke about trading guns for dope.  "But it was just very lighthearted."  *Id.* at 66.  The interview "was very light, jovial, even, at times, very good rapport."  *Id.* at 65.

About halfway through the interview, they were interrupted because the search team was leaving and they needed to show Grenkoski the warrant.  Only the interviewers and SA Highsmith stayed behind after the search.  Hopkins did not notice a change in the interview's tone after the search team left the house.

Det. Hopkins testified that they took a break about an hour before the interview ended, during which SA Highsmith searched the theater room.  Hopkins did not stay with Grenkoski during the break.  He and Rosing went downstairs while Grenkoski stayed upstairs.  They did not

monitor Grenkoski using the bathroom.

Concerning Grenkoski's phone, Det. Hopkins remembered that it rang. He did not recall Grenkoski asking to use it. D.E. 424 at 50. He testified, "I recall from reviewing the tape that he requested . . . if he should silence the phone, and I think Officer Rosing agreed that he could silence it." *Id*. at 48. At some point, Grenkoski told Hopkins he had left his phone downstairs at the request of another officer. But the phone was returned to Grenkoski during the interview. When it rang, the interviewers did not tell Grenkoski not to answer it. Eventually, one of the officers asked "if he would consent to the search of it, and he said, sure, he didn't care." *Id*. at 70. Rosing and Grenkoski looked at the phone together; the phone was not seized. Hopkins agreed that a person could say "I don't care" when they feel they have no choice. *Id*. at 76.

After the interview, "a storage facility came up." D.E. 424 at 51. Grenkoski gave Hopkins a key to search the storage facility, but Hopkins was unable to get to it because there was a locked gate and no one at the facility would answer the phone. The storage building was never searched. They returned the key to Grenkoski.

> [B]efore we departed, we told him to get up with us if he had anything else, and he said that he would. And he inquired about how to do that, if he could contact one of us and the other one -- let the other one know. And we said that we could and left information with him.

D.E. 424 at 74-75.

## C. IRS Officer Rosing

The third witness was the other interviewer, Jeremy Rosing. Now retired (but working under contract as a DEA investigator), Rosing was a financial crimes task force officer with the IRS at the time of the Grenkoski interview. At the search, Rosing was assigned to identify financial documents and interview Grenkoski. Rosing recalled there was a meeting of 12-15 officers and investigators the night before the search. Rosing had also talked to the prosecutors before the

6

search.  It was an AUSA and the lead investigator (presumably Jared Sullivan) who drafted the interview questions.  Officer Rosing testified the questions were not designed to incriminate the interviewee; they were about EHC's practices and the interviewee's role at EHC.  The point of the interview was to learn how the business side (not the medical side) of EHC worked.

At the December 12 meeting, the team was instructed to let subjects know they did not have to talk to them.  The interviews were not to be custodial, so no *Miranda* warnings would be needed.

On the morning of December 13, Officer Rosing did not witness the breach of Grenkoski's door.  He was not on the entry team; he was in his car at the time.  He said there may have been as many as 14 officers and investigators at Grenkoski's house.  He went inside 15 to 20 minutes after the initial entry.  He participated in the search (for financial and business records) for 5 to 10 minutes.  He saw SA Highsmith sitting with Grenkoski at the kitchen table and joined them.  It was "just all kind of general small talk" in the kitchen.  D.E. 424 at 88.

At first, Officer Rosing testified that Grenkoski was told at the kitchen table, before they went upstairs for the interview, that he was free to leave.  D.E. 424 at 91.  But he later clarified he believed Det. Hopkins told Grenkoski "that he did not have to talk to us, that it was something along the lines of it was his chance to tell his side of the story but that he did not have to talk to us."  But he did not think "anything was specifically said that you can leave."  *Id*. at 93.  On cross-examination he explained again that he did not hear the words "free to leave."  What happened was:

> Detective Hopkins arrived, and we were sitting there [a the kitchen table].  He came up, introduced himself to Dr. Grenkoski, advised him why we were there, that we were wanting to speak to him about Express Health Care and his role there, that he did not have to talk to us, but this was his chance to tell his side of the story.  But—and something along those lines, that he didn't have to talk to us, but we would like to so we can get a good understanding of how the business worked, but that he was

7

not under any obligation to talk to us.

*Id*. at 100.

Officer Rosing knew Det. Hopkins would be recording the interview.  Grenkoski took the interviewers upstairs to the theater room and chose his own seat.  The room was "very large, very oversized, cushy furniture, very open, kind of a very relaxing atmosphere," not at all like a station house interview room.  D.E. 424 at 102.  The door was open the entire time.  Grenkoski was not told he was being recorded and was not given *Miranda* warnings.  It was Hopkins, not Rosing, that primarily asked questions.  Rosing testified that in his work, four-hour interviews are not uncommon, though "the majority" last "much less than four hours."  *Id*. at 95.  The interviewers sat six to eight feet away from Grenkoski.

> it was a friendly interview, a fact-gathering interview.  It wasn't—we are not there pushing for information.  If he wanted to give it, he could give it.  If not, he was free not to.  It was not—it was not an interrogation.  It was a friendly interview.

*Id*. at 96.

> It was a very kind of light atmosphere.  Very—he's very cordial.  I mean, it's kind of like sitting there talking with your dad, just back and forth, no pressure.  He was making jokes, very forthcoming with the interview, you know, telling us that he—that we treated him well and just kind of very light, like you are sitting there with a family member or good friend, talking, and just a very light, casual interview.

*Id*. at 109.

Officer Rosing said it was not his intention to prolong the interview to wear Grenkoski down.  The interview took so long because:

> we took a couple breaks, that they had to come in and search, and we were interrupted a couple times.  And the majority of it took Mr. Grenkoski—he elaborated in a great deal about the questions, offering up his own examples and descriptions and was very forthcoming with information to the point he was saying basically, I want you guys to understand how this works, how Suboxone and all that stuff works.  So he provided very elaborate, long answers.

D.E. 424 at 104.

Concerning the cellphone, Officer Rosing testified Grenkoski did not have it at first. Grenkoski said an agent had asked him to leave it on a table next to a computer. At some point, Grenkoski got his phone back. The interviewers did not tell him not to use it.

> So I heard the phone ring. And it rang a couple times, and he said—I believe he said, "That's probably my wife calling." And then he asked, "Do you want me to put it on silence?" And I believe I said something like, "Yes, yes, if you will." And then it rang a few more times, and he said, "She's going to keep calling until I answer. Do you want me to turn it off?" And I said, "Yes, if you will."

D.E. 424 at 107-08. Later,

> We asked him if we could take a quick look at [the cellphone], and he agreed, "no problem." He held the phone and went through it, and he advised us that he didn't use the phone all that much for work anyway, scrolled through a few things, and would suffice for us that it didn't appear much was on there, and then he shut it. It probably took a few seconds for all that, maybe half a minute or something like that.

*Id*. at 108-09.

Officer Rosing gave testimony similar to Hoskins's about the storage building. Another IRS agent found the keys. Rosing asked Grenkoski about them. Grenkoski said they could use them and search the storage unit, but the officers returned the keys without searching it. Grenkoski offered to accompany them or give them the access code, but they did not take him up on this offer.

### D. DEA Special Agent Highsmith

The fourth witness was Thomas Wayne Highsmith, a DEA Special Agent for almost 25 years. He knew about the Grenkoski search about a week before it happened. He was at the house during the initial entry but did not go inside until the all-clear was sounded 10 to 15 minutes later. He was there to assist the FBI, and an FBI agent asked him to sit with Grenkoski. SA Highsmith knew there would be an interview team and he was not there "to elicit any kind of interview or confession from him." D.E. 424 at 122. They were together in the kitchen for about 45 minutes

before Grenkoski left for the interview. They only made small talk; SA Highsmith was not talking to Grenkoski "in a law enforcement capacity." *Id*. at 123. Officer Rosing was also present for most of that 45-minute period. Highsmith did not recall Rosing asking Grenkoski anything about the investigation. Highsmith did not remember anything about Grenkoski's phone.

At some point, Highsmith heard there was someone outside the house, and he went to meet them. It was Grenkoski's mother-in-law, sitting in her car. Highsmith testified he was the second officer to talk to her.

> She asked what was going on. I said there was a federal search warrant being executed at the house. I believe she asked if she could go in and see Mr. Grenkoski, and I said that the scene is secure until we're done with the search warrant and no one is allowed in or out of the house that doesn't live there or wasn't already there.
>
> I believe she asked me if he was talking to the police. I told her I didn't know. And then she asked if he had a lawyer, and I said I didn't know either. She said she was going to get him a lawyer, and I said, "He's an adult man; it's his right to say whether he wants a lawyer or not."

*Id*. at 127-28.

SA Highsmith was asked if he told Grenkoski's mother-in-law to stay in her car or told her she would be arrested if she did not.

> I don't think it's something I would have told her because she could have gotten out of her car if she wanted to. I think I would have told her, if she tried to enter the residence, you'll be detained, just because the site was secure until we were done with the search warrant.

*Id*. at 128.

SA Highsmith encountered Grenkoski again when he went upstairs to search the theater room. That was the last room to be searched. It was 12:45 to 1:00 p.m. Highsmith asked Grenksoski about a shotgun that had been found. Grenkoski replied it was his son's skeet-shooting gun. Highsmith asked Grenkoski whether his mother-in-law should be let inside if she returned.

10

### E.  Grenkoski's Mother-in-Law and Wife

The two final witnesses were Grenkoski's mother-in-law and his wife, who was out of town the day of the search.  They testified that Grenkoski usually answers their phone calls right away.  When he failed to answer their calls that morning, they became concerned.

Sue Vanhoose, Grenkoski's mother and law, drove in her car to Grenkoski's house with her daughter Carolyn Grenkoski live on speakerphone.  She pulled into the driveway and saw police officers standing around the house.  Ms. Vanhoose testified that an officer approached her. When she asked if her son-in-law was okay, the officer said he was okay; Grenkoski was "just being detained."  D.E. 424 at 139.  Ms. Vanhoose left, but soon returned and encountered the same officer again.  She asked to speak to Grenkoski.  She started to get out of her car, and the officer said "if I got out of the car, he would arrest me."  *Id*. at 140.  On cross-examination, Ms. Vanhoose testified the officer was already outside on both occasions.  He was not uniformed and had no identification of his agency of employment.  This all happened "probably before lunch."  *Id*. at 142.

Mrs. Grenkoski testified that on the day of the search she "was actually living in Georgia with our oldest son."  D.E. 424 at 144.  Her testimony tracked her mother's.  She could hear the officer say that Grenkoski was "just being detained."  *Id*. at 147, 151, 153.

### II.  Custody and *Miranda*

A few preliminary observations are in order.  The Court places no weight on the fact that an officer at the scene (possibly SA Highsmith, and possibly not[3]) told Ms. Vanhoose that Grenkoski was "being detained."  The test the Court must apply concerns how a reasonable person

---

[3] SA Highsmith testified that he interacted with Ms. Vanhoose, including telling her "she couldn't come onto the residence until the search warrant was done being executed."  But he denied that he told her that "she couldn't speak with her son-in-law because he was being detained."  D.E. 424 at 129-30.  He believed he was the second person to encounter her.  *Id*. at 128.

in Grenkoski's position and innocent of any crime would have assessed his situation. *United States v. Panak*, 552 F.3d 462, 469 (6th Cir. 2009). The "subjective views harbored by either the interrogating officers or the person being questioned" are not relevant. *Yarborough v. Alvarado*, 541 U.S. 652, 663 (2004). And Grenkoski would not have known that he was being characterized as "detained" by someone not even in the house with him.

### A. Legal Standards for *Miranda* Violation

The first of two issues is whether Grenkoski was subject to custodial interrogation without being read his *Miranda* rights. The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Supreme Court has held that certain warnings, such as the right to the presence of an attorney, to remain silent, and that any statement made may be used against the Defendant in a criminal trial, must be given before any custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Thus, the *Miranda* doctrine sets forth rules of police procedure applicable to "custodial interrogation." *Oregon v. Mathiason*, 429 U.S. 492, 494 (1977).

Here, the interviewers did not inform Grenkoski of his *Miranda* rights. And there is no evidence suggesting he was given *Miranda* warnings by anyone else.

However, to avail himself of the *Miranda* doctrine, Grenkoski must show he was subject to custody *and* interrogation prior to making the incriminating statements.

"[F]or the *Miranda* doctrine to apply, *both* custody and interrogation must exist." *United States v. Magana*, 70 F. App'x 859, 863 (6th Cir. 2003). "Custody" and "interrogation" are terms of art under *Miranda.* Interrogation includes "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *United States v. Woods*, 711 F.3d 737, 740-41 (6th Cir. 2013).

12

There is no dispute that Grenkoski was subject to interrogation. Instead, this case turns on whether Grenkoski was in custody. There is no dispute that Grenkoski was not placed under formal arrest.

In asserting a *Miranda* claim, the defendant bears the initial burden of establishing—by a preponderance of the evidence—that he was in custody. *See Colorado v. Connelly*, 479 U.S. 157, 169 (1986); *United States v. Lawrence*, 892 F.2d 80 (6th Cir. 1989) (table); *United States v. Charles*, 738 F.2d 686, 692 (5th Cir. 1984); *United States v. Solomon*, No. 6:13-CR-40-ART-HAI-5, 2015 WL 5474395, at *9 (E.D. Ky. Sept. 17, 2015).

The term "custody" is meant to capture "circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508-09 (2012). "Custody" exists when, in light of the objective circumstances, (1) a reasonable person would have felt not at liberty to terminate the interaction and leave and (2) the interview exhibited "the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.* at 509.

> In determining whether someone is "in custody" for purposes of *Miranda*, courts focus on "the objective circumstances of the interrogation" and "how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action." [*United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009)] (citation omitted). "The ultimate inquiry is whether, under the totality of the circumstances, the interviewee's freedom of movement was restrained to a degree associated with formal arrest." *United States v. Luck*, 852 F.3d 615, 621 (6th Cir. 2017) (citing *Panak*, 552 F.3d at 465). We have identified four, non-exhaustive factors to help guide this inquiry: "(1) the location of the interview; (2) the length and manner of the questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told that he or she did not need to answer the questions." *United States v. Hinojosa*, 606 F.3d 875, 883 (6th Cir. 2010).

*United States v. Zabel*, 35 F.4th 493, 502 (6th Cir. 2022).

## B. Analysis

The Court now applies the "*Panak*" factors identified above.

### 1.  Location of the Interview

First, the location of the interview weighs against a finding of custody.  This first factor is a significant hurdle for Grenkoski because courts have explained that, absent physical restraint or brandishing of weapons, in-home interviews are presumptively non-custodial.

> If a home is a "castle . . ., a secure redoubt from the cares of the world, it presumably is the one place where individuals will feel most unrestrained in deciding whether to permit strangers into the house, in moving about once the police are there, in speaking as little or as much as they want, in curbing the scope of the interview or in simply asking the officers to leave.  It is the rare homeowner who has not exercised these types of control at some point in encountering uninvited visitors.  No doubt, some individuals may find it more difficult to do these things during a visit by the police.  But all individuals, the meek and the brazen alike, generally will find it easier to exercise such control on their home turf than at the station house.

*United States v. Panak*, 552 F.3d 462, 465-66 (6th Cir. 2009).

A person's home "generally does not present a coercive environment."  *United States v. Hinojosa*, 606 F.3d 875, 883 (6th Cir. 2010).  Thus, "when police question a suspect in a residence, the encounter often will not rise to the kind of custodial situation that necessitates *Miranda* warnings."  *Panak*, 552 F.3d at 466 (citation and quotation marks omitted).  This is because an "important factor" underlying the *Miranda* rule is the interrogator's goal of "isolating the suspect in unfamiliar surroundings for no purpose other than to subjugate the individual to the will of his examiner."  *Id*.  These concerns "simply do not apply to most in-home interrogations."  Thus, with some exceptions, "an in-home encounter between the police and a citizen generally will be non-custodial."  *Id*.

Grenkoski therefore must point to some unusual circumstance to surmount the general presumption that in-home interviews are noncustodial.

This Court previously found a home interrogation custodial when the Defendant (1) was handcuffed the entire time (including being handcuffed face down at the outset), (2) was told he

had been caught committing a serious crime, and (3) was given no indication he was free to leave. *United States v. Sydnor*, No. 6:16-CR-21-ART-HAI-2, 2016 WL 8672913, at *7-8 (E.D. Ky. Dec. 9, 2016). This case is unlike *Sydnor* because Grenkoski was never handcuffed and officers never implicated him in criminal activity aside from the fact that a search warrant was being executed related to EHC.

In a codefendant's case, Judge Van Tatenhove found a home interrogation custodial. *United States v. Barnett*, No. 6:21-CR-13-GFVT-HAI-2, 2022 WL 1498106 (E.D. Ky. May 11, 2022). In *Barnett*, as here, the home of Barnett and codefendant Taylor was entered by over a dozen agents with guns drawn. However, unlike this case, Barnett was kept seated in her kitchen for *five hours* before the interview began. The Court found that Barnett's lengthy detention in the kitchen and the extended "police-dominated environment" had a lasting effect on Barnett's understanding of whether she was free to leave. *Id*. at *4. During this pre-interview phase, Barnett "was not permitted free movement around her home, was separated from Dr. Taylor, had her cell phone confiscated, and had to leave the door open in view of a male officer when she went to the restroom." *Id*. at *5. When it came time for the interview, "unlike, for example, the physical removal of the handcuffs, no clear signal was given to Ms. Barnett that her previous restriction on movement had been lifted." *Id*. at *6. Then, "she was interviewed in a basement theater room by three officers, was told where to sit, and was aware of the presence of several more officers outside of a nearby door." *Id*. at *5. Barnett "did not have access to her own phone during her interview," but the officers "provided her an opportunity to use one of their cell phones to make a phone call if she wanted to." *Id*. at *6. Barnett also "was not told that she was free to leave or that she could stop her interview if she elected." *Id*. Her interview lasted two and a half hours. *Id*. at *2. In summary,

> [Barnett's] home was police-dominated, her freedom of movement before her interview was heavily restricted and a reasonable person would not have understood that her prior detention had been lifted, because her interview lasted for two hours, and because she was never told that she could leave her home or stop her interview. Though the questioning of Ms. Barnett itself was not aggressive or unduly burdensome, the totality nonetheless weighs in favor of [custody].

*Id.* at *7.

Just as noted in *Sydnor* and *Barnett*, that the interview occurred at the suspect's home is a factor that weighs against a finding of custody. The Court also ascribes some significance to the fact that Grenkoski chose the room in which his interview occurred, led the interviewers there, and chose his own seat. These facts add some weight to the non-custody side of the scales. However, even "an inherently comfortable and familiar environment" like one's home can be made "unduly hostile, coercive, and freedom-restraining," depending on the number of officers, the show of authority, the conspicuous display of drawn weapons, and the nature of the questioning. *Panak*, 552 F.3d at 466. Such factors will now be considered in turn.

**2. Length and Manner of Questioning**

Here, the interview was over four hours long. Caselaw generally suggests that interview lengths of 90 minutes or less weigh against custody,[4] while interview lengths of longer than two hours weigh in favor of custody.[5] Thus, the length itself, as a raw factor, weighs in favor of custody.

However, the hearing testimony and the recording demonstrate that the length of the

---

[4] *See, e.g.*, *United States v. Martinez*, 795 F. App'x 367, 374 (6th Cir. 2019) (80-minute interview "not itself problematic"); *United States v. Hughes*, 640 F.3d 428, 437 (1st Cir. 2011) (90-minute interview "relatively short"); *United States v. Gillman*, 432 F. App'x 513 (6th Cir. 2011) (80-minute interview noncustodial); *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999) (observing the interview "lasted only an hour and a half"); *United States v. Eaton*, 954 F. Supp. 2d 646, 650 (W.D. Mich. 2013) (interview of up to 90 minutes "favors a finding of non-custody").

[5] *See, e.g.*, *Yarborough v. Alvarado*, 541 U.S. 652, 665 (2004); *United States v. Holt*, 751 F. App'x 820, 824 (6th Cir. 2018) (finding a two-hour interview time weighed in favor of custody); *United States v. Tummins*, 517 F. App'x 342 (6th Cir. 2013) (finding a two-hour interview custodial without explicitly stating the length of the interview weighed in favor of custody).

16

interview was driven by Grenkoski's own verbosity. He was eager to explain the inner workings of the business side of EHC. His responses to questions were fulsome and educational. The interviewers testified that they did not try to draw out the interview, in fact it went longer than they preferred.

As for the tone of the interview, the officers testified that nothing threatening or accusatory was said. The interviewers simply asked questions (most of which were prepared by someone else), and Grenkoski provided lengthy responses. The Court finds that the interview would have been significantly shorter had Grenkoski chosen more terse answers or not engaged in so much banter with the officers.

In sum, while the interview was lengthy (and its length weighs in favor of custody), the manner of questioning completely counterbalances this factor. The length of the interview cannot weigh heavily in favor of custody when it ballooned due to Grenkoski's own loquaciousness. In light of the casual and non-threatening tone of the interview, this second factor is neutral.

### 3. Restraint on Freedom of Movement

Grenkoski was never handcuffed or physically restrained. The same was true of Barnett, but Barnett's case features several circumstances that tipped this factor in favor of a finding of custody. The first issue in *Barnett* was the "police-dominated atmosphere." That circumstance is similar here. Both searches featured over a dozen agents, mostly armed, who filled and surrounded the house. The agents remained and either searched or guarded the premises after all guns were holstered following the initial entry. The Court agrees that law enforcement's initial show of force was intimidating. But that does not mean that an interview conducted over 45 minutes after that initial entry was custodial.

A key factor in *Barnett* was that she was kept in the kitchen for five hours before her

interview began.  Judge Van Tatenhove found that this circumstance would have affected her understanding of whether she was free to leave.  Here, in contrast, Grenkoski waited in the kitchen for only 45 minutes before the interview.  The circumstances here are significantly less extreme than in *Barnett*.

Also different from *Barnett* are the facts that Grenkoski chose his own interview room and his own seat.  He was not accompanied at all when he took a break to use the bathroom—the officers went downstairs while he stayed upstairs.  D.E. 424 at 67-68, 105.  He had two interviewers rather than Barnett's three.  Each of these differences is less indicative of custody.

Like *Barnett*, this case involves restraints on use of a cellphone.  Barnett's phone was "confiscated" during the initial security sweep.  *United States v. Barnett*, No. 6:21-CR-13-GFVT-HAI-2, 2022 WL 1498106, at *1 (E.D. Ky. May 11, 2022).  The agent who held the phone saw incoming text messages from EHC's lawyer, but he did not open or read them.  *Id*.  Barnett's phone was seized and not returned to her until long after the search and interview.  *See* D.E. 263.  But officers "provided her an opportunity to use one of their cell phones to make a phone call if she wanted to."  *Barnett*, 2022 WL 1498106, at *6.

Here, in contrast, Grenkoski's phone was not confiscated.  An agent asked him to leave it downstairs, and he complied.  Then the phone was returned to him at some point before or during the interview.  The phone rang during the interview, and the evidence establishes that Grenkoski's wife and mother-in-law were trying to call him that day.

The key moment occurs about one hour, sixteen minutes into the recording.  One can hear the ringing phone interrupting the questions.  As the phone rings, Grenkoski asks:

Grenkoski:      That mine or yours?

Rosing:          It's yours

| Grenkoski: | Oh, that's my wife. |
| --- | --- |
| Rosing: | Yeah, do you want to silence it?  For right now? |
| Grenkoski: | Yeah, I don't know how.  Cause she's doing the thing.  I could probably tell her . . .  She's called six times today. |
| Rosing: | Yeah, if you will, just, could you maybe put it on silent or something? |

The phone temporarily stops ringing and Officer Rosing begins a question:

| Hopkins: | How long, while we're on that subject . . . |
| --- | --- |
| [phone rings] | |
| Grenkoski: | It's gonna keep doing that until I answer her. |
| [phone stops] | |
| Hopkins: | How long after a patient's established, about how much time do you spend . . .? |
| [phone rings again] | |
| Grenkoski: | You want me to turn it off? |
| Rosing: | Yeah, if you will. |
| [phone stops ringing, as Grenkoski apparently silences it or turns it off] | |
| Rosing: | We will apologize to her later. |
| Grenkoski: | You're gonna have to. |
| Hopkins: | [Humorously] We'll beg for mercy.  How long does that, the established patient . . . how long do you spend with a patient that's established? |

(Court's transcription).  So, it sounds as though Grenkoski hangs up on his wife as many as three times and then ultimately turns off his phone or places it on silent mode at the request of Officer Rosing.

Grenkoski argues that the fact he was encouraged to silence his phone shows he was under some restraint on his freedom.  D.E. 367 at 9.  It is true that an interviewee's unrestrained freedom

to use his phone is a factor indicative of non-custody. *United States v. Levenderis*, 806 F.3d 390, 400-01 (6th Cir. 2015). The restriction on phone use here weighs in favor of custody, but not terribly heavily. As noted, Grenkoski appeared eager to answer questions, and the ringing phone interfered with the interview. Officer Rosing suggested to Grenkoski that he silence the phone. Rosing testified that, though he encouraged Grenkoski to turn off or silence his phone, Grenkoski never expressed a desire to make a call. D.E. 424 at 108. And Det. Hopkins agreed when asked whether "the preference was that [Grenkoski] not answer the phone." *Id*. at 48. That Grenkoski never answered the repeated calls from his wife indicates that he may have felt not totally free to use the phone. But this is not so severe a restraint on his freedom of movement that it rendered the situation anything close to equivalent to formal arrest.

Grenkoski argues there was "no clear signal that his restriction on his freedom of movement had been lifted either before or after the interview." D.E. 367 at 10. However, there was a clear moment of transition between the time spent in the kitchen making small talk and the time when Grenkoski led the officers upstairs for the interview. As Det. Hopkins testified, he arrived late to the search. When he found Grenkoski sitting in the kitchen with Highfield and Rosing, he asked Grenkoski if he would be willing to speak with them. When Grenkoski agreed, Hopkins asked for a quieter place. Grenkoski then led them upstairs to the theater room. The moment when Grenkoski agreed to talk (and the location shifted) was a clear moment of transition where Grenkoski took the lead to a certain extent.

One fact that weighs against a finding of restraint of movement is that Grenkoski expressed an interest in following up with the interviewers at a later date. Det. Hopkins testified on redirect:

> Hopkins:    I know before we departed, we told [Grenkoski] to get up with us if he had anything else, and he said that he would. And he inquired about how to do that, if he could contact one of us and the other one—let the other one know. And we said that we could and left information with him.

| Q: | So, at least, from your perspective of what, kind of, objectively he relayed to you, he was willing to continue speaking with you and offer additional information if he thought of it? |
| --- | --- |
| Hopkins: | That's correct. |
| Q: | And he asked for contact information to be able to do that? |
| Hopkins: | That's correct. |

D.E. 424 at 74-75.  An interviewee's expressed willingness to follow up with the interviewers is indicative of lack of restraint of freedom of movement.  *United States v. Panak*, 552 F.3d 462, 467 (6th Cir. 2009); *United States v. Eaton*, 954 F. Supp. 2d 646, 651 (W.D. Mich. 2013).

Det. Hopkins and Officer Rosing testified that during the interview they sat at least six feet away from Grenkoski.[6]  Grenkoski argues their close physical proximity to him indicated restraint on freedom of movement.  D.E. 452 at 13.  But he provides no authority for this assertion.  The Court does not find that the approximate six-foot distance between the interviewers and Grenkoski is indicative of custody.

Finally, Grenkoski's post-hearing brief makes much of the fact that Grenkoski told Hopkins and Rosing prior to the interview that he felt "freaked out" by the officers' show of force upon initial entry.  D.E. 452 at 15-16; *see also* D.E. 424 at 55-56, 116 (hearing transcript).  As previously noted, the Court must consider the objective circumstances, not the defendant's subjective feelings.  *Yarborough v. Alvarado*, 541 U.S. 652, 663 (2004).  No doubt the initial entry by the search team was disturbing.  But courts have often found interviews to be non-custodial

---

[6] Det. Hopkins estimated he sat "probably eight feet or so" from Grenkoski, and he rejected the suggestion that they were only three feet apart.  D.E. 424 at 52-53.  He then clarified it was six to eight feet "at least.  It was a pretty good size room."  *Id*. at 54.  If he wanted to touch Grenkoski, Hopkins would have had to get up and leave his seat.  *Id*. at 54-55.  "It wasn't crowded."  *Id*. at 62.  Officer Rosing likewise testified he was "probably roughly eight feet" away from Grenkoski.  He rejected the idea it could have been "three or four feet," but acknowledged that six feet was possible.  *Id*. at 96.  He testified he was trained to sit six feet away from an interview subject.  *Id*.

even when they follow the sudden entry of multiple officers with weapons drawn entering a home or business to execute a search warrant. *See, e.g.*, *United States v. Haque*, 315 F. App'x 510, 519 (6th Cir. 2009) (finding an in-home interview noncustodial after entry of twelve armed agents executing a search warrant). A show of force that occurred some time prior to the interview does not translate to a subsequent restraint on the interviewee's freedom of movement.

**4. Not Required to Answer Questions**

A recent Sixth Circuit case explained:

> No one factor is dispositive, but "[w]hether investigators inform a suspect that he is free to leave or to refuse to answer questions is the most important consideration in the *Miranda* custody analysis." *United States v. Martinez*, 795 F. App'x 367, 371 (6th Cir. 2019) (citing *Howes v. Fields*, 565 U.S. 499, 515 (2012)). In fact, we have held that when law enforcement officers provide clear assurances that a person is free to leave or terminate questioning, those assurances "likely would . . . guarantee[ ] the noncustodial nature" of the interview. *See Panak*, 552 F.3d at 468.

*United States v. Zabel*, 35 F.4th 493, 503 (6th Cir. 2022). In this case, the recording does not capture anyone telling Grenkoski he can leave or decline to answer questions. However, the interviewers provided testimony on this subject.

First, Det. Hopkins testified he asked Grenkoski "if he would be willing to speak with us." D.E. 424 at 45. As Hopkins explained in more detail on cross-examination:

> I walked into the kitchen, and I went to the table. I introduced myself as being my name, who I worked with, and asked him if he would be willing to talk to us. And he answered that he was just a little freaked out with the people coming to the door, all the people, you know, that was there. And so I further explained what I wanted, you know. I wanted to talk to him, ask him some questions about EHC or ask him if he was willing to talk, and that's when he said he was a little freaked out. I said, well, I would like to ask you some questions about EHC, how it's ran, to get his side of how things were done. I explained to him it's up to him. He didn't have to.

D.E. 424 at 55-56. These exchanges happened before the recording began. And Det. Hopkins admitted he never told Grenkoski he was free to leave and did not know if anyone else had told

him that.  He explained he "didn't see it as a custodial interview."  *Id*. at 63.

Officer Rosing corroborated Hopkins's testimony.  Rosing initially said that Grenkoski was told at the kitchen table, before they went upstairs for the interview, that he was free to leave.  D.E. 424 at 91.  But he later clarified he believed Det. Hopkins told Grenkoski "that he did not have to talk to us, that it was something along the lines of it was his chance to tell his side of the story but that he did not have to talk to us."  But he did not think "anything was specifically said that you can leave."  *Id*. at 93.  On cross-examination he explained again that he did not hear the words "free to leave."  What happened was:

> Detective Hopkins arrived, and we were sitting there [at the kitchen table].  [Det. Hopkins] came up, introduced himself to Dr. Grenkoski, advised him why we were there, that we were wanting to speak to him about Express Health Care and his role there, that he did not have to talk to us, but this was his chance to tell his side of the story.  But—and something along those lines, that he didn't have to talk to us, but we would like to so we can get a good understanding of how the business worked, but that he was not under any obligation to talk to us.

*Id*. at 100.

Thus, both interviewers testified that, prior to the interview (and prior to the recording being activated), Det. Hopkins told Grenkoski he did not have to answer questions.  This testimony is uncontradicted.  The Court finds Det. Hopkins told Grenkoski he was free to decline an interview.  For sure, this advice was never repeated during the ensuing four-plus hours.  But the presence of this advice is the most important factor.  *Zabel*, 35 F.4th at 503.  And it weighs against a finding of custody.  This factor would be weightier against custody if Grenkoski had *also* been told he was free to leave.  But the lack of notification that one is "free to leave" is not dispositive of custody.  *United States v. Levendris*, 806 F.3d 390, 401 (6th Cir. 2015) (no custody, though suspect not told he was free to leave); *United States v. Panak*, 552 F.3d 462, 467 (6th Cir. 2009) (no custody, although "officers never told Panak that she need not answer their questions or could

end the interview at will"); *United States v. Robinson*, 217 Fed. App'x. 503, 509, 2007 WL 507875, at *5 (6th Cir. 2007) (no custody, though suspect not told he was free to leave).

The facts here are slightly different from *Barnett*. There, Judge Van Tatenhove that before the interview, "Ms. Barnett was told that she was not under arrest and that she could not answer any question if she chose. But she was not told that she was free to leave or that she could stop her interview if she elected." *United States v. Barnett*, No. 6:21-CR-13-GFVT-HAI-2, 2022 WL 1498106, at *6. (E.D. Ky. May 11, 2022). "[S]he was never told that she could leave her home or stop her interview." *Id*. at *7.

Likewise, Grenkoski was never told he could leave or that he could *stop* the interview once it began. But the warning to Grenkoski was more robust than Barnett's. Barnett was merely told she did not have to answer every single question. Grenkoski was told he did not have to submit to an interview at all. The testimony of the interviewers was clear and consistent that Grenkoski was told he did not have to talk to them. Accordingly, this factor also weighs against custody.

In sum, the weightiest factors here are the location of the interview, the manner of questioning, and that Grenkoski was told he did not have to answer questions. The interview was at Grenkoski's home, in a comfortable room of his choosing. He led the agents there and chose his own seat; the door remained open. The tone of the interview was non-threatening. And Grenkoski was so forthcoming, the interview stretched beyond four hours. He was told before it began that he did not have to answer questions. But Grenkoski was eager to tell his story and explain his business.

Considering the relevant factors, Grenkoski's interview was not custodial as to trigger *Miranda*. He was not subject to "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Panak*, 552 F.3d at 471. Officers did make an initial showing of

force upon entering and securing the home. However, after that initial burst of activity died down, 45 minutes passed and a reasonable person in Grenkoski's situation would have felt free to decline or terminate the interview and leave.

The Court's main focus is what occurred *during* the interview. *United States v. Swan*, 842 F.3d 28, 31 (1st Cir. 2016) ("[I]n conducting the *Miranda* analysis, we focus on the time that the relevant statements were made."); *United States v. Wallace*, 323 F.3d 1109, 1113 (8th Cir. 2003) ("Our main focus must be on the individual's restraint *during the interview*."). Here, the Court accepts the interviewers' testimony that Grenkoski was told he did not have to submit to an interview. And, otherwise, the recording speaks for itself. The interview was cordial and driven by Grenkoski's own eagerness to tell his story and educate the interviewers about the business side of medication-assisted addiction treatment. *Even if* a reasonable person in that situation would not have felt free to terminate the interview and leave, the circumstances were not so coercive and oppressive as to mimic the sort of station-house interrogation described in the *Miranda* opinion. *Howes v. Fields*, 565 U.S. 499, 508-09 (2012). Grenkoski's December 2018 statements were not obtained in violation of *Miranda*.

### III. Voluntariness

#### A. Legal Standards for Voluntariness

Due Process prohibits the admission of coerced confessions procured by means "so offensive to a civilized system of justice that they must be condemned." *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994) (citing *Miller v. Fenton*, 474 U.S. 104, 109 (1985)). "When a defendant claims that a confession was coerced, the government bears the burden of proving by a preponderance of the evidence that the confession was in fact voluntary." *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999) (citing *United States v. Wrice*, 954 F.2d 406, 410 (6th Cir.

25

1992)).

The Sixth Circuit has established three requirements to prove that a confession was involuntary: "(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in defendant's decision to offer the statement." *Mahan*, 190 F.3d at 422 (citing *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir. 1988)).

"Coercive police activity is a necessary predicate to a finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment. *Colorado v. Connelly*, 479 U.S. 157, 166 (1986). Courts must look to the totality of the circumstances to determine whether a defendant's will was overborne in a particular case. *Mahan*, 190 F.3d at 422. Relevant factors include the defendant's age, education and intelligence; whether the defendant has been informed of his constitutional rights; the length and extent of the questioning; and the use of physical punishment, such as the deprivation of food and sleep. *Id*. at 422-23.

### B. Analysis

In his final brief, Grenkoski argues:

> The police dominated the atmosphere from the beginning. Detective Hopkins suggested that Dr. Grenkoski take the officers to a different location to conduct the interview, he was never told he was free to leave or expressly told he did not have to answer any questions, and the police freaked the Defendant out by their actions raiding his house, brandishing their weapons, keeping them visible, and by the overwhelming number of law enforcement officers present in his home. Officers were "assigned" to sit with him. His freedom to talk with his loved ones was curtailed as was his freedom to see them face to face. Family members were told they would be arrested if they tried to enter the house. Any reasonable person would have felt coerced into answering questions. Therefore, any statements made by Dr. Grenkoski in the environment were non-voluntary and any evidence derived from his statements should be suppressed.

D.E. 452 at 15-16.

26

In this case, the government has proven by a preponderance of the evidence that Grenkoski's statements were voluntary. The facts relevant to custody are also relevant here. Grenkoski was told at the outset that he did not have to participate in the interview. During the interview, Rosing and Hopkins asked mostly preprepared questions in a relaxed manner. They did not restrain him. After the initial entry, there was no show of force. The interviewers made no threats and never accused Grenkoski of a crime. They used no tricks or coercive tactics. They applied no physical punishment. Grenkoski was, however, asked to silence his phone. None of the circumstances indicate objectively coercive police activity. None of the events threatened to overbear Grenkoski's will. Grenkoski was 63 years old at the time of the interview. He was a medical doctor. This case presents a highly intelligent and educated man who was subjected to no physical punishments or threatening behavior during his interview. Nothing indicates that his will was overborne by coercive police activity.

### IV. Conclusion

For the reasons discussed above, the undersigned **RECOMMENDS** that Defendant Mark Grenkoski's motion to suppress (D.E. 284) be **DENIED.** Grenkoski's interview was not "in custody." Nor were his statements involuntary.

**IT IS HEREBY ORDERED THAT** the Clerk of Court shall **STRIKE** as untimely the government's post-hearing brief at Docket Entry 466.

The Court issues this Recommended Disposition pursuant to 28 U.S.C. § 636(b)(1)(B). The parties should consult that statute and Federal Rule of Criminal Procedure 59(b) concerning the right to appeal to the District Judge. Any objection must be filed within **fourteen days** of the entry of this order. Failure to object per Rule 59(b) waives a party's right to review. Upon expiration of that fourteen-day period, this matter will be submitted to Judge Van Tatenhove for

27

his consideration.

      This the 21st day of October, 2022.

Signed By:

*__Hanly A. Ingram__*

**United States Magistrate Judge**