UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | Criminal No. 6:21-cr-00013-GFVT-HAI-4 |
| ) | |
| v. ) | |
| ) | **MEMORANDUM OPINION** |
| MARK GRENKOSKI, ) | **&** |
| ) | **ORDER** |
| Defendant. ) | |
| ) | |

*** *** *** ***

This matter is before the Court on Magistrate Judge Ingram's Recommended Disposition on Defendant Mark Grenkoski's Motion to Suppress. [R. 470; R. 284.] Two agents interviewed Dr. Grenkoski at his home while other agents were executing a search warrant. Dr. Grenkoski believes his statements should be suppressed because the interview was a custodial interrogation absent *Miranda* rights and his statements were involuntary. [R. 284.] Judge Ingram disagrees on both grounds and recommends denying the Motion. [R. 470.] Dr. Grenkoski objected to the Recommended Disposition. [R. 491.] Dr. Grenkoski was not in custody during the interview and his statements were voluntary, so his Objection **[R. 491]** is **OVERRULED**, the Recommended Disposition **[R. 470]** is **ADOPTED** as and for the opinion of the Court, and the Motion to Suppress **[R. 284]** is **DENIED**.

I

The Indictment charges Dr. Grenkoski with a number of offenses related to his employment as a physician at EHC, a medical facility founded by his co-defendant, Dr. Robert Taylor. [R. 1.] Federal agents began investigating EHC on suspicion of improper opioid

prescribing practices around late 2017. [R. 424 at 17.] At 9:28 a.m. on December 13, 2018, approximately fourteen federal agents executed a search warrant at Dr. Grenkoski's residence. [R. 284-1; R. 424 at 24.] Most agents were armed and at least one was "brandishing" his firearm. [R. 424 at 26.] The agents knocked on the door, wearing raid outfits, and Dr. Grenkoski answered. *Id.* at 22. Some agents asked him to step outside and directed him to the back of the home, while others entered the home. *Id.* After the agents completed the initial sweep, they holstered their weapons and began the search. *Id.* at 34.

At this point, Dr. Grenkoski went back into his home and sat in his kitchen with Agent Highsmith and Agent Rosing for around forty-five minutes. *Id.* at 88, 122-24. The three men made small talk during this time. *Id.* Detective Hopkins arrived, introduced himself, and asked Dr. Grenkoski if he was willing to answer questions about EHC. *Id.* at 45. Dr. Grenkoski responded that he was "a little freaked out" by the agents coming to his home. *Id.* at 56. Detective Hopkins explained that he wanted to ask "about EHC, how it's ran, to get [Dr. Grenkoski's] side of how things were done" and that "it was up to him" and "he didn't have to." *Id.* at 56; *see also id.* at 93 ("[Detective Hopkins] advised [Dr. Grenkoski] that he did not have to talk to us, that it was something along the lines of it was his chance to tell his side of the story but that he did not have to talk to us."). Dr. Grenkoski agreed to the interview.

Detective Hopkins testified that, due to the ongoing search, the kitchen was "loud and busy" and "not a good place to try to hold a conversation." *Id.* at 48. He requested a quieter location for the interview and Dr. Grenkoski led them to a theater room upstairs. *Id.* at 49. Other agents had asked Dr. Grenkoski to leave his phone downstairs, to which he responded, "sure" and left it with them. *Id.* at 69. Detective Hopkins characterized the theater room as "quite a bit larger" and "more spread out" than a typical interview room. *Id.* at 61-62. If there

2

was a door to the room, it was open throughout the interview. *Id.* at 62. Dr. Grenkoski chose his seat and the agents sat around eight feet away. *Id.* at 52-53, 102. No agent read Dr. Grenkoski his *Miranda* rights. [R. 424 at 45, 83.]

The interview lasted around four hours. *Id.* at 63. Detective Hopkins testified that Dr. Grenkoski caused it to last so long by giving "long and narrative" answers to their questions. *Id.* at 64. The agents testified that they did not intend for it to last that long or "make the interview as long as possible to try to wear him down." *Id.* at 63-64. Agent Rosing perceived the interview as "very light" and "jovial" and felt there was a "comfortable" "back-and-forth." *Id.* at 65. Dr. Grenkoski made jokes throughout the interview. *Id.* Around the two-hour mark, Dr. Grenkoski commented that he felt more comfortable with the agents. *Id.* at 77.

Two events interrupted the four-hour interview. First, an agent returned Dr. Grenkoski's phone to him. *Id.* at 48, 107. It rang a few times and he asked the agents if they wanted him to silence it. *Id.* Agent Rosing testified that he responded with "something to the effect of, 'yeah, if you will.'" *Id.* at 70. The phone continued ringing, Dr. Grenkoski said his wife would call until he answered, and he asked if they wanted him to turn it off. *Id.* at 108. Agent Rosing again responded "yes, if you will." *Id.*

Second, Agent Doran, who was assisting with the search, asked Detective Hopkins and Agent Rosing if he could search the theater room about half-way through the interview. *Id.* at 30. The agents agreed and all three left the room to take a break. *Id.* at 50. During this break, the agents went downstairs while Dr. Grenkoski remained upstairs and used the restroom. *Id.* at 51, 67. The interview resumed after the break.

In his Motion to Suppress, Dr. Grenkoski argues that his statements during the interview should be suppressed because his interview was a custodial interrogation not preceded by

3

*Miranda* rights in violation of the Fifth Amendment and because his statements were involuntary. [R. 284.] Judge Ingram conducted an evidentiary hearing on the motion and prepared a Recommended Disposition. [R. 470.] He recommends denying the Motion because Dr. Grenkoski was not in custody and made voluntary statements. Dr. Grenkoski objects to both conclusions. [R. 491.]

## II

### A

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. This right is guarded by the prophylactic rule established in *Miranda v. Arizona*, which requires law enforcement officers to give specific warnings before conducting a custodial interrogation. 384 U.S. 436, 444 (1966); *Stansbury v. California,* 511 U.S. 318, 322 (1994). "Police officers are not required to administer *Miranda* warnings to everyone . . . they question." *Oregon v. Mathiason,* 429 U.S. 492, 495 (1977). The warnings are required only "when there has been such a restriction on a person's freedom as to render him 'in custody.'" *United States v. Hinojosa*, 606 F.3d 875, 883 (6th Cir. 2010) (citing *Oregon,* 429 U.S. at 495).

To determine whether a suspect was "in custody," courts consider the totality of the circumstances surrounding the encounter "with the ultimate inquiry turning on whether a formal arrest occurred or whether there was a restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009) (citing *Stansbury,* 511 U.S. at 322) (internal quotation marks omitted). This inquiry is objective, focusing on how "a reasonable person in the suspect's position would perceive his or her freedom to leave," rather than the suspect's actual mindset. *J.D.B. v. North Carolina*, 131 S. Ct.

4

2394, 2402 (2011) (internal citations and quotation marks omitted).  The Sixth Circuit articulated the following factors to guide this inquiry:

> (1) the location of the interview; (2) the length and manner of the questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told that he or she did not need to answer the questions.

*Hinojosa*, 606 F.3d at 883 (citing *Panak,* 552 F.3d at 465; *United States v. Swanson,* 341 F.3d 524, 529 (6th Cir. 2003); *United States v. Salvo,* 133 F.3d 943, 950 (6th Cir. 1998)).  The Court must consider the totality of the circumstances, guided by the non-exhaustive *Hinojosa* factors, to determine whether Dr. Grenkoski was in custody during his interview with Detective Hopkins and Agent Rosing.  *See* 606 F.3d at 883.

1

The location of the interview weighs against a finding of custody.  Dr. Grenkoski's interview occurred in a theater room on the upstairs floor of his home.  [R. 424 at 48.]  Judge Ingram found the circumstances of the interview did not overcome the "presumption that in-home interviews are noncustodial."  [R. 470 at 14.]  Dr. Grenkoski objects, arguing his home became custodial because (1) he only "chose" the location of the interview to comply with an agent's request for a quiet location, (2) the ongoing search created a coercive, police-dominated environment, (3) he was discouraged from using his cellphone, and (4) he was not told he was free to leave or not answer questions.  [R. 491 at 5-7.]

The Sixth Circuit describes the home as:

> [P]resumably [] the one place where individuals will feel most unrestrained in deciding whether to permit strangers into the house, in moving about once the police are there, in speaking as little or as much as they want, in curbing the scope of the interview or in simply asking the officers to leave.

*United States v. Conder*, 529 F. App'x 618, 622 (6th Cir. 2013).  Because individuals are most unrestrained at home, interviews inside of one's own home often do "not rise to the kind of

custodial situation that necessitates *Miranda* warnings." *Id.* But a reasonable person's understanding of whether they are free to leave can be impacted if agents remove the "unrestrained" freedoms of their home. *United States v. Craighead*, 539 F.3d 1073, 1084-85 (9th Cir. 2008). Ultimately, an in-home interview becomes custodial when agents "transform one's castle into an interrogation cell." *Panak*, 552 F.3d at 466.

This factor weighs against a finding of custody because the agents' conduct during and preceding Dr. Grenkoski's interview did not transform his home into an interrogation cell. First, Dr. Grenkoski argues that the agents coercively secluded him from the search by interviewing him in a separate room. [R. 491 at 6.] After Dr. Grenkoski agreed to speak with the agents, Detective Hopkins asked him if there was a quieter location for the interview. [R. 424 at 101.] Dr. Grenkoski recommended the upstairs theater room and led the agents there. *Id.* He concedes that he chose the "seclusive" location but claims that by requesting a quieter location, "law enforcement [rather than himself] was in control." [R. 491 at 5-6.]

Detective Hopkins's request for a quieter location did not make the interview location coercive. It was entirely reasonable for law enforcement to seek a quieter location because approximately ten agents were actively searching the home. Detective Hopkins testified that he asked for a quieter room because it was "loud and busy" in the kitchen, "just not a good place to try to hold a conversation." [R. 424 at 48.] The ultimate decision on the location was in Dr. Grenkoski's hands. He could have selected a "more open setting" or remained in the kitchen, but he chose the "more seclusive" theater room. [R. 491 at 6.] Therefore, the fact that his interview was in the theater room rather than a more open location does not suggest he was in custody.

An in-home interview can also become custodial when the residence becomes "police-dominated." *Craighead*, 539 F.3d at 1084-85. "The number of officers, the show of authority,

the conspicuous display of drawn weapons, [and] the nature of the questioning all may transform one's castle into an interrogation cell." *Panak*, 552 F.3d at 466. Dr. Grenkoski claims his home became police-dominated because at least eight agents entered the home with their firearms brandished. [R. 491 at 6.]

Dr. Grenkoski's home could have become police-dominated if a reasonable person would "perceive [the officers' presence and conduct] as unduly hostile, coercive and freedom-restraining." *Panak*, 552 F.3d at 466. The agents' conduct at Dr. Grenkoski's home did not rise to this level. *Haque* is instructive. Twelve agents executing a search warrant entered a home wearing raid jackets and with their weapons drawn. *United States v. Haque*, 315 Fed. App'x 510, 519 (6th Cir. 2009). "However, the weapons were holstered and the raid clothing was removed once the house was secured." *Id.* The officer who interviewed the suspect homeowner arrived later in plain clothes, asked if they could talk, and the suspect agreed. *Id.* "During the interview, [the suspect] was not handcuffed, his movement was not restricted, and nothing was recorded. [The suspect] was initially nervous, but later grew relaxed." *Id.* The Sixth Circuit agreed with the district court's judgment that the suspect was not in custody. *Id.*

The same is true for Dr. Grenkoski. Eight agents initially entered the home, wearing raid outfits and with their weapons drawn, to conduct a security sweep. [R. 424 at 25.] After the home was secured, the search began and up to fourteen agents were present.[1] *Id.* at 24. The agents holstered their firearms during the search. *Id.* at 34. The agents did not handcuff or restrain Dr. Grenkoski at any point and, while he initially said he was "freaked out" by the agents' presence, he later indicated he was "more comfortable." *Id.* at 77. This is nearly

---

[1] The three law enforcement agents who testified at the evidentiary hearing recalled different numbers of agents who were present during the search. [R. 424 at 24, 84, 121.] Special Agent Doran's estimate of fourteen was the highest. *Id.* at 24.

7

identical to *Haque*. While the circumstances of the initial entry and search may have been intimidating, they did not make Dr. Grenkoski's home so police-dominated that it was similar to an interrogation cell.

Naturally, Dr Grenkoski compares his questioning to that of his co-defendant Ms. Barnett, claiming they were subjected to similarly police-dominated interviews. [R. 491 at 6.] The Court suppressed statements that Ms. Barnett made to agents during an interview conducted in her home while agents executed a search warrant. [R. 236.] It found her interview overcame the presumption that an in-home interview is non-custodial because: at least a dozen officers entered her home with their guns drawn, she was detained in her kitchen for five hours before the interview, had to use the restroom in view of a male officer, was regularly surrounded by officers, and was taken to a basement room for her interview during which multiple officers stood outside the door. *Id.* at 9.

Dr. Grenkoski's interview is distinct. True, a number of agents also entered his home with their weapons drawn. But they did not detain Dr. Grenkoski for five hours before his interview or require him to use the bathroom in sight of an agent. In fact, they allowed him a bathroom break mid-interview during which the agents went to another floor of the home. [R. 424 at 67.] Unlike Ms. Barnett, he also chose the location of the interview, decided where he sat, and officers were not standing outside of the room. *Id.* at 49. Dr. Grenkoski's interview was not police-dominated to the same extent as Ms. Barnett's.

Neither the "seclusive" interview location nor the degree of police presence transformed Dr. Grenkoski's home into an interrogation cell. Therefore, the circumstances do not overcome the presumption that his in-home interview is non-custodial. Dr. Grenkoski additionally claims that the agents turned his home into a custodial environment because they discouraged him from

8

using his phone and did not tell him he was free to leave. [R. 491 at 6-7.] While these arguments are relevant to the custody analysis, they are typically not analyzed in relation to the location inquiry. The Court will address these arguments at the appropriate stage of the analysis.

**2**

The length and manner of Dr. Grenkoski's questioning also weigh against custody. It is undisputed that the interview lasted approximately four hours. [*See* R. 424 at 46.] Interviews longer than two hours typically weigh in favor of finding custody. *See, e.g.*, *Yarborough v. Alvarado*, 541 U.S. 652, 665 (2004); *United States v. Holt*, 751 Fed. App'x 820, 824 (6th Cir. 2018). Accordingly, Judge Ingram observed that "the length itself, as a raw factor, weighs in favor of custody." [R. 470 at 16.] But the Government argues, and Judge Ingram agrees, that this interview was unique and its length should not be considered as a "raw factor." *Id.* at 16-17. Judge Ingram found that "the length of the interview was driven by Grenkoski's own verbosity." *Id.* In objection, Dr. Grenkoski suggests the cause of the lengthy interview is irrelevant, arguing "the case law is clear" that interviews longer than two hours weigh in favor of custody. [R. 491 at 7.]

Dr. Grenkoski's position neglects the purpose behind considering the length of the interview. A lengthy interview is relevant to the custody inquiry because it suggests law enforcement restrained the interviewee's freedom of movement to the degree of a formal arrest. *See Holt*, 751 Fed. App'x at 823. Inherently, whether officers restrain an interviewee's movement depends on the actions of law enforcement, not the interviewee. The interviewee's actions cannot restrain his own freedom of movement.

Dr. Grenkoski's actions, not the agents', caused the interview to last four hours. There is nothing to suggest that the interviewing agents took any action that extended the interview.

9

Rather, Agent Rosing testified it was not his "goal" for the interview to last that long and that it did because of Dr. Grenkoski's "very elaborate, long answers." [R. 424 at 104.] Law enforcement should not be required to cut an interview short when a suspect is giving elaborate answers to their questions in fear that the interview would otherwise become custodial. *See Moran v. Burbine*, 475 U.S. 412, 426 (1986) (discussing the "subtle balance" *Miranda* struck between effective law enforcement and compelled admissions). Because Dr. Grenkoski, not the agents, caused the interview to last four hours, the length of the interview does not suggest he was in custody.

Judge Ingram also found the manner of questioning was not threatening or accusatory. [R. 470 at 17.] Dr. Grenkoski did not challenge this finding in his objection. Nevertheless, the Court agrees. The agents never had to "badger" him for information or raise their voices. [R. 424 at 104.] They asked him questions primarily concerning EHC's operations and he gave long, narrative answers. *Id.* at 56, 64. While the inquiry is objective, it is telling that Dr. Grenkoski was joking with the agents throughout the interview. *Id.* at 65. The interview had a "light, jovial" tone with "good rapport." *Id.* Such questioning is not analogous to stationhouse questioning. This factor weighs against a finding of custody.

### 3

Dr. Grenkoski's freedom of movement was not restrained to a degree that he would not feel free to leave. Judge Ingram primarily compared Dr. Grenkoski's freedom of movement to that of his co-defendant Ms. Barnett, finding his did not share the custodial elements of hers. [R. 470 at 17-22.] Dr. Grenkoski objects, arguing that his movement was restrained in a similar manner as Ms. Barnett. [R. 491 at 8-10.] He specifically relies on the fact that he did not have his cell phone for some of the interview then agents encouraged him to not use it, was always in

the presence of law enforcement, and was "freaked out" by the agents' conduct preceding the interview. *Id.*

Agents never physically restrained Dr. Grenkoski. *See United States v. Martinez*, 795 Fed. App'x 367, 375-76 (6th Cir. 2019). He argues that other circumstances surrounding the interview restrained his freedom of movement to a degree comparable to formal arrest. [R. 491 at 8.] First, he argues he did not have his phone at the beginning of the interview and the agents asked him not to answer it after it was returned. [R. 491 at 8.] Agents had asked Dr. Grenkoski to leave his phone in the kitchen, to which he responded "sure." [R. 424 at 69.] At some point during the interview, the phone was returned. *Id.* It rang repeatedly, Dr. Grenkoski asked if the agents would like him to silence it, and Agent Rosing responded "yes, if you will." *Id.* at 70. It continued ringing, Dr. Grenkoski asked if he should turn it off, and Agent Rosing again responded "yes, if you will." *Id.* at 107-08.

The Court agrees with Judge Ingram's conclusion that this restriction on his ability to use his phone "weighs in favor of custody, but not terribly heavily." [R. 491 at 18.] Twice, Agent Rosing discouraged Dr. Grenkoski from answering his phone. Discouraging an interviewee from answering calls from their spouse does restrain their freedom to a degree. *Cf. United States v. Levenderis*, 806 F.3d 390, 400-01 (6th Cir. 2015) ("Defendant was also able to place and receive phone calls during the interviews, something a reasonable person in police custody would not feel free to do."). But this slight imposition is insufficient to make the interview custodial on its own and is not paired with other circumstances restraining Dr. Grenkoski's freedom of movement to a similar degree as stationhouse questioning.

Second, the agents did not subject Dr. Grenkoski to a similarly controlling degree of police presence and direction as Ms. Barnett. Agents detained Ms. Barnett for five hours before

11

her interview. [R. 236 at 13.] They also required her to use the bathroom with the door open in view of a male officer. *Id.* at 11. Those aspects had a lasting effect on her interview and turned it into a custodial interrogation because there was no "clear signal" that the prior restraints on her movement were lifted. *Id.* at 13.

In contrast, Dr. Grenkoski was only in his kitchen in agents' presence for forty-five minutes while agents conducted an initial sweep of the home and began the search. [R. 424 at 122.] The agents also allowed him to use the bathroom without supervision. *Id.* at 68. The law enforcement presence was not nearly as controlling as Ms. Barnett's. Further, Detective Hopkins clearly signaled a break between Dr. Grenkoski's time in the kitchen and the interview. He asked Dr. Grenkoski if he would answer questions about how EHC was operated, emphasized that the interview was optional, and allowed Dr. Grenkoski to select the location. *Id.* at 56. This made clear to Dr. Grenkoski that the interview was a distinct stage of the day, mitigating any impact of agents' actions preceding the interview.

Finally, while Dr. Grenkoski told the agents he was "freaked out" *before* the interview, his own statements show that he grew relaxed as he spoke with the agents. [R. 424 at 77.] He eventually joked with them, provided long, narrative answers to their questions, and told them he felt more comfortable. *Id.* at 77; 109. In *Haque*, the fact that the interviewee grew relaxed during the interview when they were previously nervous weighed against custody. 315 Fed. App'x at 519. Ultimately, the agents did not restrain Dr. Grenkoski's freedom of movement to the same degree as a formal arrest.

### 4

The final *Hinojosa* consideration weighs slightly against a finding of custody. "Whether the investigators inform a suspect that he is free to leave or to refuse to answer questions is the

12

most important consideration in the *Miranda* custody analysis." *Martinez*, 795 Fed. App'x at 371. Dr. Grenkoski argues that this factor weighs in his favor because the agents did not tell him he could leave or decline to answer questions. [R. 491 at 10.] Judge Ingram found that, while there is no evidence the agents told Dr. Grenkoski he was free to leave, they did tell him that the interview was optional. [R. 470 at 23.]

The Court agrees that this factor weighs against a finding of custody. First, the record belies Dr. Grenkoski's claim that the agents did not tell him he did not have to answer their questions. [R. 491 at 10-12.] When asking Dr. Grenkoski if he would speak with agents about EHC's operations, Detective Hopkins told him "it's up to him. He didn't have to." [R. 424 at 56.] Agent Rosing corroborated this testimony. *Id.* at 100. Detective Hopkins clearly communicated that the interview was optional by stating that Dr. Grenkoski did not have to participate. *Id.* This factor would weigh even less in his favor if he were additionally told he could leave. But both warnings are not required. *Martinez*, 795 Fed. App'x at 371 ("Whether investigators inform a suspect that he is free to leave *or* to refuse to answer questions is the most important consideration in the *Miranda* custody analysis." (emphasis added)).

This factor only weighs slightly against a finding of custody because Dr. Grenkoski was not told he was free to leave in addition to being told the interview was optional. Had he received both assurances, they "likely would . . . guarantee[ ] the noncustodial nature of" the interview. *Panak*, 552 F.3d at 468. By receiving half of the recommended assurances, this factor weighs slightly against a finding of custody.

5

The interview was not custodial because the totality of the circumstances did not create an environment comparable to stationhouse questioning. *Panak*, 552 F.3d at 468. Dr. Grenkoski

chose the location of the interview and where he sat, took a restroom break halfway through the interview, during which the agents went to a different floor of the home, and agents did not detain him for hours before the interview. [R. 424 at 101-02, 51, 122.] While the agents' presence initially made him "freaked out," he later became relaxed and even joked with them. *Id.* at 77, 109. The tone of the interview was non-confrontational and agents never physically restrained Dr. Grenkoski. *Id.* at 109. Most important, Detective Hopkins clearly informed Dr. Grenkoski that the interview was optional and made the intentional choice to participate. *Id.* at 56. The agents' initial armed intrusion and partial restraint on Dr. Grenkoski's ability to use his phone are insufficient to overcome these facts and the presumption that one's home is non-custodial. *See Haque*, 315 Fed. App'x at 519. The agents did not subject Dr. Grenkoski to a custodial interrogation, so suppression of his statements is unwarranted.

**B**

Dr. Grenkoski also seeks suppression because his statements to the agents were involuntary. In addition to the Fifth Amendment's protection against compelled self-incrimination, the Due Process clause of the Fourteenth Amendment prohibits the use of coerced confessions at trial. *Miller v. Fenton*, 474 U.S. 104, 109 (1985). The Court suppresses the confession if the method of obtaining it was "so offensive to a civilized system of justice that they must be condemned." *Id.* Three factors influence whether a confession was coerced: "(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement." *United States v. Mahan*, 190 F.3d 416, 423 (6th Cir. 1999) (citing *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir.1988)). The inquiry is ultimately one of the totality of the circumstances, asking whether the statement was "the

product of free and rational choice rather than any police coercion." *Id.* The Government bears the burden of establishing that the statement was voluntary. *Id.* (citing *United States v. Wrice*, 954 F.2d 406, 410 (6th Cir.1992)).

Judge Ingram found that Dr. Grenkoski's statements were not the product of undue coercion. [R. 470 at 27.] His conclusion was based on the many factors weighing against custody: the agents told Dr. Grenkoski he did not have to participate in the interview, the tone of the interview was relaxed, the agents never restrained Dr. Grenkoski, there was no show of force after the initial entry, the agents did not threaten or accuse Dr. Grenkoski, "they used no tricks or coercive tactics," and there was no physical punishment. *Id.*

Further, the suspect's age, education, and intelligence are relevant to this inquiry. *Mahan*, 190 F.3d at 422-23. Judge Ingram found that as a sixty-three-year-old doctor, Dr. Grenkoski is a "highly intelligent and educated man" who would not have been coerced in these circumstances. [R. 470 at 27.] Dr. Grenkoski objects. [R. 491 at 12-14.] He claims he was coerced by: the number of agents who entered his home with weapons drawn, not being allowed to use his phone, not being given *Miranda* warnings, and being told the interview was his "chance to tell his side of the story." *Id.*

The circumstances as a whole show that Dr. Grenkoski chose to speak with the agents and chose to provide them with comprehensive answers to their questions. True, he did not receive *Miranda* warnings, agents discouraged him from using his phone, and the day began with an armed intrusion and search of his home. These facts may have a degree of coercive impact but did not overbear Dr. Grenkoski's will. *Mahan*, 190 F.3d at 422. Many other factors emphasize that Dr. Grenkoski chose to participate in the interview by his own free will. He was allowed a break and left alone during the interview, chose the location of the interview, and had

15

"great rapport" with the agents. [R. 424 at 65, 67.] Most important, Detective Hopkins told him interview was optional. *Id.* at 57. Stating that the interview was Dr. Grenkoski's "chance to tell his side of the story" was not coercive because it was *immediately* preceded by a statement that he "did not have to talk to [the agents.]" *Id.* at 95, 100.

It is difficult to imagine how interview responses could be the product of an overborne will when the suspect chose to participate and gave more comprehensive answers than the agents sought. *Id.* at 104 ("He elaborated in a great deal about the questions, offering up his own examples and descriptions and was very forthcoming with information."). While he was initially "freaked out" and was told the agents wanted "his side of the story," he clearly made an intentional choice to speak with the agents. *Id.* at 56. There is no indication he made this choice because of any coercive pressures. The totality of the circumstances show that Dr. Grenkoski's statements were "the product of free and rational choice rather than any police coercion." *Mahan*, 190 F.3d at 423. Accordingly, his statements were voluntary and need not be suppressed.

### III

The totality of the circumstances show that a reasonable person in Dr. Grenkoski's shoes would have felt free to leave the interview because it was in his own home in a room of his own choosing, the questioning was collegial, and Detective Hopkins told him he did not have to participate. His statements were voluntary because the record shows he chose, the agents did not coerce him, to participate in the interview. Accordingly, and the Court being sufficiently advised, it is hereby **ORDERED** as follows:

1. Dr. Grenkoski's Objection **[R. 491]** is **OVERRULED**;

2. Judge Ingram's Recommended Disposition **[R. 470]** is **ADOPTED** as and for the Opinion of the Court; and,

3. Dr. Grenkoski's Motion to Suppress **[R. 284]** is **DENIED**.

This the 12th day of December, 2022.

Gregory F. Van Tatenhove
United States District Judge